**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| JON R. DEUTSCH, | § | |
| Plaintiff, | § | |
| V. | § | |
| | § | |
| ROY HENRY, | § | A-15-CV-490-LY-ML |
| Defendant. | § | |

| | | |
|---|---|---|
| | § | |
| JON R. DEUTSCH, | § | |
| Plaintiff, | § | |
| V. | § | |
| | § | A-15-CV-807-LY-ML |
| DRAKER ENTERPRISES, INC., | § | |
| Defendant. | | |

| | | |
|---|---|---|
| | § | |
| JON R. DEUTSCH, | § | |
| Plaintiff, | § | |
| V. | § | |
| | § | A-15-CV-1238-LY-ML |
| CHIWAWA, INC., | § | |
| Defendant. | | |

| | | |
|---|---|---|
| | § | |
| JON R. DEUTSCH, | § | |
| Plaintiff, | § | |
| V. | § | |
| | § | A-16-CV-88-LY-ML |
| CHRIS D. CLARK AND RONI CLARK, | § | |
| Defendants. | | |

| | | |
|---|---|---|
| JON R. DEUTSCH, | § | |
| Plaintiff, | § | |
| V. | § | |
| | § | |
| LA TIERRA DE SIMMONS FAMILIA | § | A-15-CV-901-RP-ML |
| LTD., | § | |
| Defendant. | | |


| | | |
|---|---|---|
| | § | |
| JON R. DEUTSCH, | § | |
| Plaintiff, | § | |
| V. | § | |
| | § | A-15-CV-974-RP-ML |
| PHIL'S ICEHOUSE INC., | § | |
| Defendant. | | |

## ORDER

Before the court are Defendants' motions for sanctions.  *E.g.*, Def. Mot. Sanctions [Dkt. #68] in *Deutsch v. Clark et al.*, 16-cv-88-LY. Defendants have filed identical motions for sanctions as well as supplemental memoranda specifying the alleged sanctionable conduct in the above-styled causes.[1]   The motions have been referred to the undersigned for disposition by United States District Judges Lee Yeakel and Robert Pitman.  *See* 28 U.S.C. § 636(b)(1)(A), Fed. R. Civ. P. 72; Loc. R. W. D. Tex. Appx. C, Rule 1(d).  Because the motions are identical and the underlying issues involve the same parties—namely Plaintiff's counsel, Omar W. Rosales ("Rosales"), and Defendants' counsel, James C. Harrington ("Harrington")[2]—the undersigned finds it appropriate to address the identical filings in a single order.[3]

Furthermore, the Magistrate Court emphasizes that this Order only deals with the issue of sanctions in these six cases.  Other pending matters regarding outstanding discovery disputes and motions to dismiss will be addressed separately.

\*       \*       \*

Normally, people resort to the court system to resolve grievances and discover the truth. In these six cases, however, Rosales has used this system to create strife and perpetuate lies.  He

---

[1] For purposes of this Order, the undersigned will refer and cite to the motion for sanctions and supplemental memorandum filed in the *Clark* case. *See* Def. Mot. Sanctions [Dkt. #68] & Def. Supp. Mem. [Dkt. #82] ("Supp. Mem. I") in *Deutsch v. Clark et al.*, 16-cv-88-LY-ML.  The undersigned reiterates, however, that Defendants have filed the same Motion and Memorandum across all causes addressed by this Order. In addition, docket citations throughout this Order reference the *Clark* case unless otherwise noted.

[2] While the individual defendants differ in each cause, Harrington represents all of them.

[3] At the September 13, 2016 Show Cause hearing, discussed *infra*, Rosales objected to the court's consolidation of these matters in a single sanction order, but did not cite any authority to support this objection. Transcript of Show Cause Hearing [Dkt. #114] ("Show Cause Tr.") at 9. The undersigned finds that judicial economy and common sense warrant this consolidation: the challenged conduct and potentially sanctionable parties are the same across all cases.  Furthermore, both district and bankruptcy courts have routinely consolidated cases in similar situations. *See generally e.g.*, *In re Carroll*, Case No. 08-10756, 2016 WL 1084287 (Bankr. M.D. La Mar. 17, 2016) (issuing joint order awarding sanctions to trustee of three separate bankruptcy estates for misconduct by debtors in multiple cases); *Shavers v. Shavers*, 2007 WL 312705 (S.D. Miss. Jan. 30, 2007) (consolidating several actions in a single sanctions order); *Chosin Few, Inc. v. Scott*, 209 F. Supp. 2d 593 (W.D.N.C. 2002) (issuing a single order awarding attorneys' fees to multiple firms as lawyer's misconduct occurred over multiple cases).

has defamed opposing counsel with false and abusive statements, attempted to derail the administration of justice with frivolous motions, and submitted fabricated evidence to subvert proceedings in this court.  Throughout, his conduct has forced the Magistrate Court to feel more like a referee in a boxing match than an impartial arbiter of the law. Defendants' sanctions motions catalogue almost a year's worth of Rosales' bad behavior.  Having reviewed the motions, the entire cases filings, and the relevant law, the undersigned finds that sanctions are not only warranted, but imperative to remedy the damage caused by Rosales' serious and pervasive misconduct in these causes.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Context and Early Proceedings

Plaintiff Jon R. Deutsch ("Deutsch") is an individual with disabilities who requires a wheelchair for mobility. Together with his lawyer Rosales, Deutsch has filed 385 lawsuits in the Austin Division of the Western District of Texas since 2015.  These lawsuits follow a similar model—Deutsch sues a small business in Austin alleging violations of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, its attendant regulations, the Americans with Disabilities Act Accessibility Guidelines ("ADAAG"), the Texas Human Resources Code ("THRC"), TEX. HUM. RES. CODE ANN. § 121.001 *et seq.*, the Texas Architectural Barriers Act ("TABA"), TEX. GOV'T CODE Ch. 469, and its Texas Accessibility Standards ("TAS").

Title III and its attendant regulations prohibit discrimination on the basis of disability in places of public accommodations, which include privately owned businesses that are generally open to the public, such as restaurants, movie theaters, schools, and recreation facilities.  *E.g.*, 42 U.S.C. § 12182.  This provision was designed to ensure equal access to individuals with

2

disabilities; to that end, Title III requires the removal of structural barriers in existing public accommodations "where such removal is readily achievable."[4] *Id.* § 12182(b)(2)(A)(iv). *See also* 28 C.F.R. § 36.304 (listing examples of, and prioritizing, readily achievable repairs). Where removal of the barrier is not readily achievable, the facility must provide access "through alternative methods if such methods are readily achievable." 42 U.S.C. § 12188(b)(2)(A)(v). To enforce Title III, the ADA contains both a private right of action and a right of action for the Attorney General. 42 U.S.C. § 12188(a)–(b). The only remedies available under the private right of action are injunctive relief and the recovery of attorneys' fees and costs. 42 U.S.C. § 12188(a)(1); 42 U.S.C. § 2000a-3(a).

The complaints in each Deutsch case, including the damages requested, are almost identical. Generally, Deutsch alleges that he could not access the defendant's facilities due to insufficient or inadequate disabled parking, lack of required signage, or thresholds or transitions between the parking lot and the business that do not meet the relevant accessibility standards. As has become clear, the violations alleged are mostly real yet *de minimis*, and the business are mostly unaware that they are not in compliance with ADA requirements. In each case, he seeks injunctive relief to cure the alleged accessibility violations, declaratory relief, statutory damages, and attorney's fees and costs.

The six lawsuits before the court fit this model. The *Henry* Defendant owns a taqueria in south Austin which Deutsch alleges lacks ADA-compliant van accessible parking, an appropriate entrance ramp, and accessible threshold. 1st Am. Compl. [Dkt. #4] in *Henry*, ¶ 2.[5] The *Clark* Defendants own a furniture store in south Austin. Deutsch claims their property lacks ADA-compliant van accessible parking and that the threshold to the establishment exceeds one-half

---

[4] The ADA defines "readily achievable" as "easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9).

[5] Deutsch's original complaint incorrectly listed Defendant's surname as his first name.

inch. Compl. [Dkt. #1] in *Clark* ¶ 8.  The *Draker* Defendants own a local restaurant chain. Deutsch complains that one of their restaurant locations lacks ADA-compliant van accessible parking, proper signage, and an accessible entrance. Compl. [Dkt. #1] in *Draker* ¶ 9.  The *Chiwawa* Defendant owns an auto repair shop; Deutsch alleges it lacks ADA-compliant van accessible parking and that the entrance exceeds one-half inch.  Compl. [Dkt. #1] in *Chiwawa* ¶ 2.  The *La Tierra* Defendant owns a dry cleaning business; Deutsch alleges the business lacks ADA-compliant van accessible parking, an appropriate entrance ramp, and that the entrance exceeds one-half inch.  Compl. [Dkt. #1] in *La Tierra* ¶ 2.  Finally, the *Phil's Icehouse* Defendant owns a restaurant and bar; Deutsch alleges the business lacks ADA-compliant van accessible parking, an appropriate entrance ramp, and that the entrance exceeds one-half inch. Compl. [Dkt. #1] in *Phil's Ice House* ¶ 2.

As mentioned, Harrington serves as counsel of record for Defendants in all six cases. When Harrington began representing these Defendants, he was director of the Texas Civil Rights Project ("TCRP"), a tax-exempt nonprofit foundation that protects the civil liberties and civil rights of low-income Texans who cannot otherwise afford counsel.  Harrington founded TCRP in 1990 and served as its executive director until he retired in September of this year. Harrington represented Defendants pro bono in all six cases in his individual capacity, and not on behalf of the TCRP.

The procedural history in these cases is copious and convoluted.  In this section, the undersigned will review the filings that have become most relevant to the issue of sanctions in these matters.

The Magistrate Court first entered the fray on January 11, 2016, when District Judge Lee Yeakel referred Deutsch's motion to quash a deposition in the *Henry* case.  *See* Pl. Mot. Quash

[Dkt. #10] in *Henry*.  The undersigned held a hearing on the motion on January 27, 2016, and chose a deposition date for the parties because they refused to agree to one on their own. Order of January 28, 2016 [Dkt. #23] in *Henry*.

Less than a month later, on February 18, 2016, the parties again appeared before the undersigned on the same case, this time to hear argument on Deutsch's motion to compel adequate discovery responses.  Pl. Mot. Compel [Dkt. #25] in *Henry*.  In the briefing on this motion and at the hearing, the rancor between the parties crystallized. Henry's response to Deutsch's motion revealed that Rosales had taken photos of persons entering the Texas Civil Rights Project. Resp. [Dkt. #33] in *Henry* at 7–8.  Henry's response argued that such actions implicated the privacy concerns of TCRP's invitees, many of whom are undocumented victims of domestic violence.  *Id.*  The response also cited disparaging and derogatory ad hominem attacks launched by Rosales at Harrington in an e-mail correspondence.  *See id.* at 3 (quoting e-mail from Rosales to Harrington in which Rosales calls Harrington a "lying draft dodger" and a "coward").  Based on these actions, these comments and others, Henry requested that the court sanction Rosales for his behavior.  *Id.* at 9–10.

In the order granting in part and denying in part Deutsch's motion to compel, the undersigned declined to impose sanctions.  However, the undersigned admonished the parties as follows: "The court is troubled by certain behavior and conduct of counsel for each side, particularly the personal insults directed towards Defense counsel by Plaintiff's counsel. . . . The court hereby warns *Plaintiff's counsel* that should he fail to amend his behavior, the court will not hesitate to grant a renewed motion for sanctions and reserves the right to impose sanctions sua sponte."  Order of February 19, 2016 [Dkt. #38] in *Henry* (emphasis added).  Despite this

admonition from the court, the parties' relationship, and especially Rosales' behavior, deteriorated.

Around this time, Harrington ramped up his discovery requests aimed at testing Deutsch's standing to bring these suits and uncovering the veracity of Deutsch's allegations that he had visited the businesses he sued at the dates and times claimed.  To this end, Harrington filed a motion to compel in *Henry* requesting production of the logbook Deutsch used to record trips to the various establishments he eventually sued.  Def. Mot. Compel [Dkt. #49] in *Henry*. Deutsch had refused to provide them in the normal course of discovery, objecting on grounds of relevance, work product, and attorney-client privilege.  *See generally* Resp. Mot. Compel [Dkt. #51] in *Henry*.  The court scheduled a hearing on this motion for May 26, 2016.  On May 20, 2016, Rosales filed an incident report with the Austin Police Department and obtained a temporary ex parte protective order against Harrington in Travis County Court, alleging that Harrington was harassing, stalking, and making terroristic threats against him.  *See* Mot. Separate Hearing Ex. 1 [Dkt. #25-1] ("Temp. Ex Parte Order") in *Clark*.  These allegations mainly stemmed from a comment Harrington made to Rosales during a deposition that he knew Rosales drove an expensive car.  *See* Supp. Mem. I Ex. 2 [Dkt. #82-2] ("Rosales Aff.").  After obtaining this ex parte protective order, Rosales filed a motion for a separate hearing in this court, arguing that the protective order prevented Harrington from being within 200 yards of Rosales at any time.  Mot. Separate Hearing at 1.  Upon learning of the protective order, Harrington sought emergency relief from the County Court.  Supp. Mem. I n.13.  The County Court conducted an evidentiary hearing on the protective order and dismissed it.  *Id.*  This court likewise dismissed Rosales' motion for separate hearing.  Order of May 24, 2016 [Dkt. #26].

Despite these hiccups, the Magistrate Court was able to hold the hearing as scheduled on May 26, 2016, during which time it ordered the parties to supplement their inadequate briefings. *See* Order of May 27, 2016 [Dkt. #57].  At this hearing, the undersigned again warned Rosales of the possibility of sanctions if he did not curtail his behavior: "Here's my warning to you. I don't want all the verbiage in [your] motions any more. . . . We're going to have an evidentiary hearing and you're going to have to back up what you say, and if you don't, I'm going to apply sanctions."  Transcript of May 26, 2016 Hearing [Dkt. #84] in *Clark*.

It also came to the court's attention that Rosales had used at least four different spellings for his client's surname across the nearly 400 cases he had filed.  As a result, the court ordered Rosales to file motions to correct and conform the spelling in all active cases. *Id*.  In a subsequent order, the court instructed Deutsch to submit both unredacted and redacted versions of the logbook for in camera review to determine whether the claims of work product and attorney-client privilege were genuine.  Order of June 17, 2016 [Dkt. #64] in *Henry*.

On June 17, 2015, Deutsch filed a motion to dismiss the *Henry* case pursuant to Federal Rule of Civil Procedure 41(a)(2), stating that the property at issue had been brought into compliance and requesting that each side bear its own costs and attorney's fees.  Pl. Mot. Dismiss [Dkt. #65] in *Henry*.[6]  Henry opposed the motion to dismiss, stating that issues of sanctions, standing, and attorney's fees needed to be resolved prior to dismissal.  Resp. Pl. Mot. Dismiss [Dkt. #67] in *Henry*.  Deutsch eventually filed motions to dismiss in all six cases referred to the undersigned; Defendants in each case oppose the motions along the same grounds asserted in the *Henry* response.

---

[6] Because Defendant had already filed an answer in this case, dismissal of Deutsch's suit requires a court order. *Compare* FED. R. CIV. P. 41(a)(1)(A) *with* FED. R. CIV. P. 41(a)(2).

### B.    The Initial Sanctions Motions

Soon after the filing of the motions to dismiss, the litigation took a turn for the worse. On June 20, 2017, Rosales filed a motion styled "Motion for Sanctions: Racial Slur Used by Defense Counsel and His Staff."  Pl. Mot. Sanctions [Dkt. #67] in *Henry*.  Rosales eventually filed identical motions in all six cases. *See* Dkt. #11 in *Draker*; Dkt. #28 in *Chiwawa*; Dkt. #48 in *Clark*; Dkt. #37 in *La Tierra*; Dkt. #20 in *Phil's Ice House*.  In this motion, Rosales alleged that Harrington and a member of Harrington's staff called him a racial slur and requested that the court refer Harrington to the State Bar of Texas. Rosales based this allegation on a March 25, 2016 e-mail Harrington sent to Rosales which contained an e-mail from Harrington's legal assistant, Aura Valdez-Payan ("Valdez-Payan"), in which she referred to Rosales as "El Sapo," the Spanish word for "toad."  Pl. Mot. Sanctions Ex. 1 [Dkt. #67-1] in *Henry*.  Citing to urbandictionary.com, Rosales stated that el sapo is a "racist term" against Mexican Americans that means "snitch" and "South American Piece Of Shit." *Id.* [Dkt. #67] at 3.  Harrington responded to Rosales' motion the next day, stating that he did not realize that he had mistakenly forwarded Valdez-Payan's e-mail until he read Rosales' motion.  Resp. Pl. Mot. Sanctions [Dkt. #68] in *Henry* at 1.  Harrington also copied the e-mail he sent to Rosales immediately upon realizing his mistake, in which he apologized: "I regret you got this inadvertently. And I apologize." *Id.* In addition, he maintained that while the use of el sapo was meant literally and pejoratively, there were no racial or ethnic connotations.  Harrington also pointed out that he never referred to Rosales by that term, rather that it was used by a TCRP employee who is Mexican-American. *Id.*

Next, on June 21, 2016, Rosales filed a motion for gag order, which accused Harrington of making "numerous comments" in the news media about the pending cases and requested the

court place Harrington under a gag order.  Mot. Gag Order [Dkt. #46] in *Clark*.  Once again, Rosales filed the same motion in all six cases.  Harrington responded, noting that Rosales' allegations were "utterly baseless," and that Rosales' argument regarding potential prejudice to a jury was nonsensical as Rosales had not requested a jury trial in any of these cases.  Resp. Mot. Gag Order [Dkt. #72] at 1.

Finally, Rosales filed a motion styled "Motion for Sanctions: Further Racist Comments by Defense Counsel" in the *La Tierra* and *Draker* cases.  Dkt. #32 in *La Tierra*; Dkt. #13 in *Draker*.  In this motion, Rosales accused Harrington of being "racist" and "insensitive" for noticing a deposition at Maudie's, a local Mexican restaurant.  The restaurant is owned by the *Draker* Defendants and forms the basis of Deutsch's suit against them. Rosales claimed it was racist to notice the deposition at Maudie's because he is Mexican-American and because Harrington knew that Rosales' first job was in a Mexican restaurant.  Pl. Mot. Sanctions II [Dkt. #13] at 1 in *Draker*.[7]  In response, Harrington noted that he set the deposition for Maudie's because (1) it was the property at issue in the lawsuit, and (2) "in earlier cases [Deutsch] could never quite remember anything about the place he allegedly visited" so Harrington wanted to avoid any recall issues. Resp. Mot. Sanctions II [Dkt. #18] in *Draker*. Recognizing the extreme nature of the allegations made in these motions, the undersigned set another hearing for August 3, 2016.  Order of July 8, 2016 [Dkt. #77] in *Henry*.

Prior to this hearing, Harrington filed his own motion for sanctions against Rosales and Deutsch in all six cases, requesting that the court impose sanctions pursuant to Rule 11 and its inherent power.  Def. Mot. Sanctions [Dkt. #83] at 1 in *Henry*.  The motions were substantively identical in five of the six cases, arguing, *inter alia*, that Rosales' sanctions motions and

---

[7] This motion contained additional incendiary accusations which the undersigned will discuss in full *infra*.

9

responsive briefings contained "knowingly false and outrageous personal attacks" against Harrington. *Id.*

Harrington's sanctions motion in the *Clark* case, filed several days later, contained an additional allegation.  In the *Clark* case, Harrington had filed a motion to compel the depositions of two witnesses, Sharon Deutsch, the Plaintiff's wife, and Andrew Rosales, Omar Rosales' brother, which the undersigned granted.  In this motion to compel, Harrington stated that he sent Rosales deposition notices for June 24, 2016, but that Rosales and the witnesses did not show up. In Rosales' response to the motion to compel, he argued again that the depositions were not relevant even though the court had previously decided otherwise.[8]  He also charged that Harrington had failed to provide deposition dates for the *Clark* Defendants, despite a court order to do so. Resp. Mot. Compel [Dkt. #62] at 9.  To support this claim, he attached a purported e-mail he sent to Harrington requesting deposition dates for the Clarks and stating "I have asked you 3 times to provide . . . dates." Resp.  Mot. Compel Ex. 4 [Dkt. #62-4].

Harrington filed his motion for sanctions in the *Clark* case subsequent to Rosales' response to the motion to compel.  The *Clark* motion contained the same request for sanctions regarding Rosales' ad hominem attacks against Harrington, but also raised a new allegation: that Rosales fabricated the e-mail attached as Exhibit 4 to his response to Defendants' motion to compel.  Def. Mot. Sanctions [Dkt. #68] at 6 in *Clark*.  Harrington stated that he had no recollection of receiving any such e-mail from Rosales regarding the Clark depositions, and that the e-mail server logs he obtained from the University of Texas at Austin, his e-mail provider,

---

[8] Rosales objected to the District Court regarding the Magistrate Court's decision to order the depositions. *See* Obj. [Dkt. #37] in *Clark*. The District Court overruled Rosales' objection and affirmed the Magistrate Court in a June 14, 2016 order. *See* Dkt. #42 in *Clark*. Rosales in turn filed a writ of mandamus with the Fifth Circuit challenging the Magistrate Court's initial order and the District Court's affirmation. *See* Dkt. #49. The Fifth Circuit summarily denied Rosales' writ on September 2, 2016. *See* Dkt. #95.

confirmed that he did not receive any e-mails from Rosales within eleven hours of the purported date stamp on the e-mail Rosales submitted to the court.  *Id.* at 6–7.

### C.      Preliminary Hearing on the Sanctions Motions

At this point, it appeared that the litigation was spinning out of control.  The Magistrate Court added Harrington's sanction motions to the hearing scheduled for August 3, 2016.  The undersigned viewed this hearing as a preliminary attempt to discuss and gain some resolution regarding the pending motions in these six cases—which included Plaintiff's motions to dismiss and motions for sanctions, as well as Defendants' motion for sanctions, and several discovery disputes.  The undersigned anticipated, however, that a full evidentiary hearing, with character and expert witnesses, would be required on the sanctions motions at a later date.

On July 26, 2016, Rosales filed a "Notice of Non-Consent to Magistrate Hearing," stating that he and Deutsch did not consent to the Magistrate Judge conducting the hearing.  *E.g.*, Notice [Dkt. #71] at 1 in *Clark*. He claimed that the Magistrate Court did not have authority to conduct the proceedings on the pending motions because one of the pending motions was a dispositive motion (a motion to dismiss) which was referred to the Magistrate Court for a Report and Recommendation.  *Id.*  Rosales cited no authority for his claim that Magistrate Judges lack authority to conduct hearings on dispositive motions referred to them.  *See id.* at 2.  The undersigned's best guess as to why Rosales neglected to cite any legal authority for this proposition?   None exists. Rosales further claimed that the undersigned "made previous statements on the record that he does not support the Americans with Disabilities Act."  *Id.*

As to Rosales' claim that the Magistrate Judge had made statements indicating a lack of support for the ADA, Rosales cited to a colloquy between himself and the undersigned from the May 26, 2016 hearing.  In the part of the exchange quoted by Rosales, the undersigned inquires

11

whether Rosales had sent demand letters to any of the 400-plus businesses prior to filing suit. The quoted exchange includes the following statement from the undersigned, "You could keep attorney's fees really low in these cases. You're not doing that. . . . [Y]ou have a right to file lawsuits. Mr. Deutsch has a right to be a plaintiff in the lawsuits." *Id.* at 3 (quoting transcript of May 26, 2016 Hearing). Rosales' argument seems to be that the undersigned, by inquiring into whether Rosales had filed any demand letters before suing 385 small businesses, indicated his lack of support for the ADA. While the undersigned regrets that Rosales labored under this misapprehension, he has noted time and again his support for this legislation and affirmed—as is clear from the quoted passage—the court's understanding that the statute provides for private litigation. On August 2, 2016, District Judges Yeakel and Pitman denied Rosales' request to have the matters heard before them instead of the Magistrate Judge. Order of August 2, 2016 [Dkt. #75] in *Clark*; Order of August 2, 2016 [Dkt. #55] in *La Tierra*.

Thus, the hearing continued as scheduled on August 3, 2016. Rosales appeared alone for the Plaintiff's side. Deutsch did not appear at the hearing despite the fact that Defendants' had issued a subpoena for his attendance. Harrington appeared for Defendants along with Charles Herring ("Herring") as conflicts counsel on the sanctions motions.[9]

At the hearing, the undersigned informed both parties that an evidentiary hearing on the sanctions motion would follow if the parties wanted to pursue their claims. Transcript of August 3, 2016 Hearing [Dkt. #88] in *Clark*. Both parties were given the opportunity to discuss the bases of their motions. Harrington and his team stated that they welcomed an evidentiary hearing on their sanctions motions and were ready to proceed accordingly. *Id.* at 3, 19.

Given the opportunity to discuss the basis for his sanctions motions, Rosales struggled to articulate any legitimate factual or legal grounds. To wit, the record showed he had requested a

---

[9] Herring was retained by the *Henry*, *Draker*, and *Clark* Defendants.

gag order in cases that did not involve juries and where, to the extent defense counsel had spoken to the media, it was solely to relay facts about the case; he claimed that noticing a deposition at a defendant's Mexican restaurant, the very restaurant his client sued, was a racist act; and, citing only to an unverified website, accused defense counsel of being racist for forwarding an e-mail in which a Mexican-American staffer referred to Rosales by the Spanish word for "toad."  In light of the paucity of evidence supporting Rosales' sanctions motions, the undersigned offered him an opportunity to withdraw those motions.  After some equivocating, Rosales indicated that he wanted to withdraw his two motions for sanctions and motion for gag order. On August 5, 2016, Rosales filed notices of withdrawal in each case. *See* Dkt. #93 in *Henry*; Dkt. #48 in *Draker*; Dkt. #42 in *Chiwawa*; Dkt. #79 in *Clark*; Dkt. #56 in *La Tierra*; Dkt. #38 in *Phil's Ice House*.

The undersigned informed Harrington that if he wanted to pursue his sanctions motion in an evidentiary hearing, the Magistrate Court would need supplemental briefing detailing the specific conduct for which he was seeking sanctions.  After reviewing this supplemental briefing, the undersigned stated a show cause order would issue regarding which conduct the Magistrate Court believed could merit sanctions; the subsequent evidentiary hearing would be cabined to that conduct.  The undersigned took these steps to ensure Rosales was afforded the due process protections of notice and an opportunity to respond and prepare his defense.  Transcript of August 3, 2016 Hearing at 56; *see* Order of August 4, 2016 (directing Defendants to file briefing regarding the alleged sanctionable conduct of Rosales and giving Rosales seven days to respond to any briefing from Defendants).

**D.** **Defendants' Consolidated Supplemental Memorandum Addressing Sanctionable Conduct and the Show Cause Order**

Defendants filed their supplemental briefing on their sanctions motions on August 10, 2016. *E.g.*, Supp. Mem. I [Dkt. #82] in *Clark*. The motion separated the alleged sanctionable conduct into nine categories. *Id.* at 1–2. Again, Defendants requested the court impose sanctions on Deutsch and Rosales pursuant to the court's inherent power and Rule 11.

The undersigned reviewed the supplemental briefing and decided to move forward with an evidentiary hearing on five categories cited by Defendants: (1) Rosales' "false, abusive statements"; (2) the allegedly fabricated e-mail; (3) the criminal stalking charge made by Rosales against Harrington; (4) Rosales' motion requesting a separate hearing from Harrington; and (5) alleged violations of the Texas Disciplinary Rules of Professional Conduct.[10] Regarding Rosales' "false and abusive statements," Defendants cited twenty-nine unique statements made by Rosales a total of 113 times in various filings across the six cases. *See* Supp. Mem. I at 4–6; *id.* Ex. 1 [Dkt. #82-1] at 1–7 (listing each discrete filing containing the complained of statements). These statements include the following representative examples:

- Harrington used "racial slurs against Plaintiff's counsel."
- Harrington believes it is "acceptable to refer to Hispanics as toads, sapos, snitches, and South American Pieces of Shit."
- Harrington's claimed use of the term sapo is "the same racist and twisted logic that refers to people of colors as monkey's [sic], gorillas, rats, and roaches."
- Harrington used "racist and anti-Semitic terms against minorities."
- Harrington "appears to have a medical issue."
- Harrington has made "continual comments" that "show a high level of hostility, racism, and hatred to people who are not the majority and white like [him]."
- Harrington "treats Hispanics like servants and 'noble savages' that need his superlative help and guidance."
- Harrington's decision to set a deposition at Defendants' Mexican restaurant was a "covert racist jab at Plaintiff's counsel"

---

[10] The undersigned declined to move forward on the following four categories: Rosales' statements concerning the Magistrate Court and Judge Yeakel; Rosales' alleged unethical settlement practices; issues relating to fee-sharing with a non-lawyer; and alleged conflicts of interests. *See generally* Supp. Mem. I.

- In arguing that Harrington's decision to notice a deposition as this Mexican restaurant evinced a racist motive: "Does Jim Harrington expect Mr. Rosales to mop the floors and bring him chips and salsa also? If Mr. Rosales were African-American, would Jim Harrington order the Deposition be held in a Church's Fried Chicken? If Mr. Rosales were Asian, would Harrington order the Deposition be held in a Chinese buffet restaurant?"
- Harrington has been "stalking Plaintiff's counsel."
- Harrington "threatened Plaintiff's counsel's life."

Supp. Mem. I Ex. 1 at 2–7.

The second category that the undersigned determined merited inclusion in the show cause hearing was the allegation that Rosales had fabricated an e-mail he submitted to the court with his response opposing Defendant's Motion to Compel in *Clark*.

Next, Defendants sought sanctions for the police report and ex parte protective order Rosales filed against Harrington in Travis County Court, based on Rosales' claims that Harrington was harassing, threatening, and stalking him.  Defendants charged that these allegations were "spurious," having stemmed mostly from a single comment Harrington made wherein Harrington said he knew what kind of car Rosales drove and how much it cost.  *See* Mot. Adv. Inf. [Dkt. #15] in *Clark*.  Relatedly, Defendants sought sanctions for Rosales' filing a motion for separate hearing in *Clark* based on the ex parte protective order. Defendants argued that Rosales' motion requesting a hearing separate from Harrington had no legitimate purpose.

Finally, the undersigned determined that Defendants' allegations that Rosales' conduct violated various Texas Disciplinary Rules of Professional Conduct merited review at the show cause hearing as well.  Generally, the rules cited prohibit attorneys from making false statements to a tribunal, offering evidence known to be false, taking positions that unreasonably delay resolution of the case, and impugning the integrity of a judge or official.

The undersigned issued the show cause order on August 23, 2016, ordering Rosales and Deutsch to appear in person for an evidentiary regarding Defendants' five categories of

allegations and whether they merited sanctions pursuant to the court's inherent power and Rule 11(c)(3). *E.g.*, Show Cause Order [Dkt. #90] in *Clark*. The Order directed both Rosales and Deutsch to appear at the hearing since Defendants were seeking sanctions against both, with the understanding that the Magistrate Court would make the requisite culpability determination as to each respondent at the hearing. *Id.* at 1. The Order further stated that with respect to the e-mail fabrication charge, it would look favorably upon a party obtaining Rosales' e-mail server logs from his e-mail provider, Yahoo, Inc. ("Yahoo"). The undersigned reasoned that these server logs, whether provided by Rosales or subject to Defendants' subpoena, would provide unequivocal proof of the e-mail's origin. *Id.* at 5–6. The Order also encouraged both parties to retain experts to testify regarding the potential e-mail fabrication, and directed that any expert must be designated and disclosed at least seven days before the hearing. *Id.* at 6.

Prior to the hearing, a few more motions were filed which the undersigned must mention. Defendants subpoenaed Yahoo requesting Rosales' e-mail headers for the dates in question. Mot. Compel [Dkt. #91-1] Ex. 1 in *Clark*. Because Rosales would not give his consent to their release, Yahoo's standard procedures required it to observe a fifteen-day grace period prior to releasing them to Defendants. Thus, Defendants filed an emergency motion, asking the court to compel Rosales to consent to Yahoo's release of the e-mail headers. The undersigned denied the motion to compel, findings that the fifteen-day grace period was not unreasonable, and that Defendants' could file a motion to continue if necessary.

Rosales also filed objections to the Magistrate Court's show cause order. Obj. [Dkt. #98] in *Clark*. In his objections, as well as in his response to Defendants' emergency motion to compel, Rosales argued that the Magistrate Court had violated Rule 11's "safe harbor" provision in allowing Defendants' sanctions motion to proceed. While Rule 11(c)(2) does include a safe

16

harbor provision, Rule 11(c)(3)—the provision under which Defendants requested sanctions and the authority by which the undersigned issued its show cause order—does not. *Compare* Fed. R. Civ. P. 11(c)(2) with Fed. R. Civ. P. 11(c)(3); *see also Elliott v. Tilton*, 64 F.3d 213, 216 (5th Cir. 1995) (explaining that, unlike subsection 11(c)(2), subsection 11(c)(3) does not contain a safe harbor provision).  The undersigned explained this distinction to Rosales in multiple orders to no avail.  Show Cause Order [Dkt. #90] in *Clark.*

Finally, the undersigned notes two motions filed by Rosales: (another) motion to recuse the Magistrate Judge and, one day before the show cause hearing was scheduled, a motion to reschedule the hearing due to a purported medical issue Deutsch was experiencing.  In the motion to recuse, Rosales argued that the undersigned had demonstrated bias and impartiality throughout these proceedings that merited recusal.  Mot. Recuse [Dkt. #99] in *Clark*.  District Judges Yeakel and Pitman denied the motion for recusal.  Order Denying Mot. Recuse [Dkt. #101] in *Clark*; Order Denying Mot. Recuse [Dkt. #79] in *La Tierra*.  Their orders stated that "Deutsch's allegations of bias and prejudice are speculative and fail to show that a reasonable person would harbor doubts about Judge Lane's impartiality in this case."  *Id.* at 6.

In his motion to reschedule the show cause hearing, Deutsch asserted that he could not appear at the hearing because he was experiencing a "serious urinary tract infection" and was scheduled to see a doctor on the day of the hearing.  Mot. Resched. [Dkt. #102] in *Clark*.  He offered to provide medical records in support. The undersigned denied the motion, based on a determination that the sanctions allegations concerned Rosales' conduct alone.  Order of Sept. 13, 2016 [Dkt. #103] at 1.  Having resolved these motions, the show cause hearing could proceed as scheduled.

### E.    Show Cause Hearing

At the hearing, Rosales appeared alone for Plaintiff. Herring and Jason Panzer ("Panzer") appeared as attorneys for Harrington. Defendants called four witnesses. Betty Balli Torres ("Balli Torres"), the Executive Director of the Texas Access to Justice Foundation, the largest funder of civil legal aid to the poor in Texas, testified first. Harrington went next, followed by Matthew L. Danner ("Danner"), a digital forensic examiner, who presented testimony on the e-mail fabrication issue. Lastly, Aura Valdez-Payan ("Valdez-Payan"), the associate of Harrington's who sent the e-mail referring to Rosales as el sapo, testified about her involvement in these cases, her own background, and her other interactions with Rosales.  Defendants offered twenty-two evidentiary exhibits.  Rosales called no witnesses and offered no exhibits.  The undersigned summarizes the relevant parts of Defendants' witness testimony below.

#### 1.    Balli Torres' Testimony

Balli Torres testified that she is a licensed attorney, has known Harrington for over twenty-five years, and has talked with him "hundreds of times."  Transcript of September 13, 2016 Hearing ("Show Cause Tr.") at 33–34.  She stated that she is aware of the allegations launched against him in these cases.  *Id.* at 34.  She testified to Harrington's "extensive" work advocating for social justice, equal rights, and civil rights with the TCRP, adding that she does not know any lawyer in Texas more dedicated to these causes.  *Id.* at 35–36.  She further testified that based on her personal experience with and knowledge of Harrington, she has never witnessed him make any statement that would be considered racist or anti-Semitic.  *Id.* at 36.

After stating that Spanish was her first language, she also addressed the use and meaning of the term el sapo.  *Id.* at 37.  She testified that she is familiar with the use of the word in Spanish, and that it is the equivalent of calling someone a toad in English.  *Id.* at 38.  She further

stated that she has never known anyone to use the word el sapo in the manner defined by the Urban Dictionary citation referenced by Rosales. *Id.*

On cross-examination, Rosales asked whether Balli Torres had ever litigated against Harrington; she stated she has not. *Id.* When asked whether Harrington has a "short temper" or is "quick to anger," she responded that she had never observed that type of behavior from him. *Id.* at 39–40. She acknowledged that el sapo was not a term of endearment. *Id.* at 41.

Before stepping down, the court inquired whether Balli Torres had an opinion as to Harrington's character trait for being the kind of person who gets along with people of different ethnicities and races. She responded that as is clear from his life's work at the TCRP, where 70 percent of the people he represents are Hispanic, she believes his reputation in this respect is "impeccable." *Id.* at 45. The court further inquired whether she is familiar with his reputation in the legal community for this trait; one again she responded that it is "impeccable." *Id.* She also stated that the reputation and opinion testimony she offered applied not just to people of color, but across all members of the community. *Id.* at 46.

## 2.    *Harrington's Testimony*

Harrington testified next and described his legal career. He stated that upon graduation from law school, he worked for ten years in South Texas on behalf of the farm workers movement. *Id.* at 51. He later returned to Austin to serve as the legal director of the Texas Civil Liberties Union. *Id.* In 1991, he founded the Texas Civil Rights Project. *Id.* For twenty-seven years, he has also served as an adjunct professor at the University of Texas School of Law. *Id.* He testified that he has litigated many antidiscrimination cases on behalf of Hispanic people, including a legal challenge to discrimination against Hispanics in grand jury selection that he

argued in front of the Fifth Circuit.  *Id.* at 52.[11]  He also advocated successfully with the Mexican American Legal Defense Fund ("MALDF") in a lawsuit that resulted in an extension the Texas Equal Rights Amendment to minority voting.

He also testified that he has served on the board of advisors for the Texas Hispanic Journal of Law and Policy as well as human rights delegations throughout Central and South America in countries such as Mexico, Honduras, Chile, and Nicaragua.  *Id.* at 56.  He discussed his current position as "Abogado Consultor del Gobierno de Mexico," a role he serves in by invitation of the Mexican government, referring cases regarding abuse of Mexican nationals in the United States.  *Id.* at 57.  In total, he stated that he has worked with and on behalf of the Hispanic community for fifty years.  *Id.* at 58–59.

Harrington testified that he was familiar with the list of "false, abusive statements" contained in Defendants' Supplemental Memorandum and cited in the court's Show Cause Order.  *Id.* at 61.  Harrington testified that none of the accusations launched by Rosales are true.  Harrington stated that he has never used "racial slurs" against Rosales.  He noted that the only word Rosales had identified as being potentially racially charged was el sapo.  Harrington stated that, in his opinion, all of the statements made by Rosales and recited in the Supplemental Memorandum were derogatory.  *Id.* at 65–66.  He added that in his forty-three years as a licensed attorney, he has never encountered another lawyer who has made statements remotely comparable to the twenty-nine statements Rosales has made in his court filings.  *Id.* at 67.

 Harrington next recounted the el sapo e-mail incident.  He noted that he inadvertently forwarded to Rosales the e-mail from Valdez-Payan containing the el sapo reference.  *Id.* at 68.  He acknowledged that the term was used in his office to refer to Rosales on occasion and that it was intended to be "mildly pejorative."  *Id.* at 68–70.  He testified that he understands the word

---

[11] *See Ciudadanos Unidos De San Juan v. Hidalgo Cty. Grand Jury Com'rs*, 622 F.2d 801 (5th Cir. 1980).

to mean toad, and that he was familiar with its usage in Spanish kids' songs and birthday songs from his work in south Texas.  He stated that he looked up the word in standard Spanish-English dictionaries and found "toad" as the sole definition, and consulted with a Spanish professor who stated the same.[12]  *Id.* at 74–75.  Regarding Valdez-Payan, Harrington noted that she was a native Spanish speaker, born in Mexico City and raised in Juarez, Mexico and El Paso, Texas. *Id.* at 71. Harrington pointed out that when Rosales brought the e-mail to his attention on June 20, 2016, he responded immediately with an apology.  *Id.*  He also clarified that he did not view the word as an ethnic slur and that Valdez-Payan did not intend it as such.  *Id.*  Harrington noted that this single appearance of the word el sapo in an e-mail not written by him was the only evidence that Rosales could cite in his effort to brand Harrington as a racist.  *Id.* at 73. Harrington's testimony also revealed that a local restaurant in Austin named itself El Sapo, and that the Texas Department of Transportation has approved license plates containing that word notwithstanding their practice of rejecting plates that contain racial or ethnic slurs, such as "gringo."  *Id.* at 78–79.

Regarding his decision to schedule Deutsch's deposition in the *Draker* case at Defendant's Mexican restaurant, Harrington explained that he made this decision because in his two previous depositions with Deutsch, Deutsch was not able to recall any details about the property he was suing.  *Id.* at 87–88.  Harrington stated he had scheduled depositions at his clients' businesses in other Deutsch cases as well.  *Id.*

As to the accusation that Harrington asked Deutsch if he was a cross-dresser, Harrington explained that he never made any such statement.  *Id.* at 88–89.  Rather, during a deposition, Harrington asked Deutsch why he visited a woman's clothing store, one of the 385 businesses

---

[12] Rosales objected that Harrington's testimony as to the Spanish professor was hearsay. This objection was overruled because the court considered it not for its truth, but rather for the fact that the professor was consulted.

Deutsch had sued.   Deutsch responded to this question by asking whether Harrington was accusing him of being a cross-dresser.   *Id.* at 88–92; *see also* Supp. Mem. I Ex. 7 ("Depo. of Jon Deutsch") at 63–64.

At the hearing, when asked why he decided to represent Defendants in these cases, Harrington testified as follows: "[I]n my view, Mr. Rosales and . . . Deutsch are undermining the ADA. He will be a poster child of a congressional attempt to amend and weaken the ADA. . . . I've done a large number of ADA cases myself, but they have always been systemic cases, nothing like this just to make money. And the danger in my view . . . is that this sort of scheme and nonsense is going to lead to a very drastic weakening of the ADA."  Show Cause Tr. at 93–94.

Rosales made several allegations regarding Harrington's purported medical condition, which Harrington discussed at the hearing.  For example, in at least one court filing, Rosales wrote: "In a bizarre e-mail, Defense counsel [Harrington] told the Plaintiff's counsel: 'I hope your wiser Angel prevails. The words (hearing angels) are characteristic of someone who is schizophrenic. If the Defense counsel is hearing angels, he needs medical treatment immediately."  Resp. Opp. Mot. Sanctions [Dkt. #70] at 7 in *Clark*.

At the hearing, Harrington addressed this specific allegation, explaining that the e-mail Rosales cited was written in response to the police report Rosales filed against Harrington accusing him of stalking and terroristic threats.  Show Cause Tr. at 96.  After learning of the police report and believing it to be groundless, Harrington e-mailed Rosales requesting that he withdraw it.  *Id.*  Included in this request was a paraphrase of Abraham Lincoln's famous line from his First Inaugural Address, "the better angels of our nature."  *Id.* at 96, 99.  Rosales, either unfamiliar with one of the most quoted passages from American oratory or feigning ignorance,

responded with the above accusations—that Harrington's behavior appeared "schizophrenic" and indicative of someone requiring "medical treatment immediately"—allegations he repeated in six separate court filings.  *See* Supp. Mem. I Ex. 1 n.20.

Harrington also gave his account regarding Rosales' alleged fabricated e-mail.  He stated that when he received Rosales' filing containing that e-mail attachment he "went back" and "looked through all my e-mails," but did not find any such e-mail from Rosales.  Show Cause Tr. at 105.  When he went to copy and paste Rosales' e-mail from the PACER PDF filing into his own Microsoft Word document, the document properties changed.  *Id.* at 109.  Specifically, the "from" and "to" fields in the e-mail header changed.   The PDF of the e-mail on PACER displayed the "from" field as Rosales' e-mail address, talon_eye@yahoo.com, and that it was sent "to" Harrington's e-mail address, jch@utexas.edu. When Harrington went to copy and paste the PDF into a Word document, however, the fields appeared as "from" talon_eye@yahoo.com *and "to"* talon_eye@yahoo.com.   *Id.* at 110–111.   In addition, the date listed on the e-mail changed from June 22, 2016 on the PACER document to July 8, 2016 on the Word document. *Id.* at 111.  Harrington also testified that he asked his e-mail provider, the University of Texas at Austin, to check their server records to see if there was any record of Rosales having sent him an e-mail on June 22, 2016.  *Id.* at 112.  UT responded that there were no such e-mails on this date. *Id.*  At this point, Harrington concluded that Rosales had fabricated this e-mail. In an attempt to gain additional independent proof, Harrington explained that Defendants subpoenaed Rosales' e-mail service provider, Yahoo, to obtain Rosales' e-mail logs from the date in question, but Rosales opposed the subpoena request.  *Id.* at 114–115.  Harrington noted it was peculiar that Rosales would oppose this request as it had the potential to unequivocally exonerate him against the charge that he fabricated this e-mail.  *Id.* at 116.

Harrington also noted that Rosales filed a grievance against him with the State Bar of Texas reciting the same allegations regarding Harrington's purported racism and mental instability that he has made in federal court.  *Id.* at 139.

In summary, Harrington testified that all of the allegations made against him—from racism, to anti-Semitism, to medical issues—were indeed false and abusive.  He testified that as a result of these allegations being launched in the pleadings and filings in these cases, national media has picked them up and his reputation is being harmed.  *Id.* at 146.

Rosales began his cross-examination of Harrington by asking the following question: "Do you support the overthrow of the government of the United States?"  *Id.* at 152.  On cross, Rosales also attempted to show that Harrington lacked knowledge of the specifics of each case, inquiring about the specific violations alleged in particular cases.  *Id.* at 158–59.  This tactic backfired, however, as it only served to reveal that Rosales could not keep straight the different defendants he had sued on behalf of Deutsch.  *See id.* (discussion showing Rosales confused the *Draker* case with the *Clark* case).  Aside from these two lines of questioning, Rosales did not present any evidentiary exhibits in his cross-examination of Harrington.

### 3.     Danner's Testimony

Danner testified next in his capacity as an expert witness.  Danner stated that he is employed as a digital forensic examiner.  *Id.* at 163.[13]  He explained that his job duties required him to "conduct investigations and examinations of digital media for the purposes of legal matters."  *Id.* at 167.  He further stated that he is a Certified Fraud Examiner, certified by the

---

[13] Before Danner could start to testify, Rosales objected that he had never received Danner's expert witness report. *Id.* at 163. Defendants countered, and the record confirmed, that they had electronically filed the expert report in accordance with the date set in the Magistrate Court's August 23rd order. Order of August 23, 2016 [Dkt. #90] in *Clark*; *see also* Def. Expert Disclosure [Dkt. #96] in *Clark*. To ensure due process, the undersigned granted a short recess to give Rosales time to review the expert report. Upon reconvening, the undersigned inquired whether Rosales had adequate time to review the report and whether he had any objections; he responded that he had reviewed it and that he had no objections. *Id.* at 166.

Association of Certified Fraud Examiners, and holds a license as a Certified Forensic Computer Examination issued by the International Association of Criminal Investigative Specialists. *Id.* at 168–69.

For his examination in this case, Danner stated he reviewed the PDF from PACER of the e-mail in question to determine if there was evidence to support fabrication. *Id.* at 171–72. Danner stated he also reviewed a document called the "PDF Reference," which is a document constructed by Adobe, the company that created PDFs. *Id.* In addition to this document, Danner used a forensic tool called "X-Ways Forensics" and standard Adobe Acrobat software to examine the PDFs in question. *Id.* at 174.   Danner testified that he also reviewed another e-mail on the PACER system as a control to compare to the e-mail in question. *Id.*   Finally, he also created an e-mail through Yahoo's mail service—Rosales' e-mail provider—to determine what would be expected in printing an e-mail to a PDF file. *Id.*

To start his examination, Danner reviewed the metadata[14] of the e-mail in question. *Id.* at 174–75.   He then used the standard tools described above. *Id.* at 175.   From this examination he concluded that Rosales' e-mail "was altered in such a way to show a different recipient and a different data transmission for the e-mail itself." *Id.*   He elaborated that he believed the e-mail was originally sent to talon_eye@yahoo.com on July 8, 2016, and not, as it appears in Rosales' filing to Harrington's e-mail on June 22, 2016. *Id.*   He noted that the Adobe software detected an additional e-mail in the "to" field underneath Harrington's e-mail address. *Id.* at 177.   He was also able to pull out additional text data within the "date" field by conducting a "copy operation" on that field and then pasting it into the text document. *Id.* at 178.

Danner also detected different font properties in the header of the e-mail between the text that is visible on the face of the document and the text he was able to "pull out" from under the

---

[14] Merriam-Webster defines "metadata" as "data that provides information about other data."

visible text. *Id.* As he testified, "[b]y simply placing a cursor in Adobe Acrobat on the text that's visible and on the text that is invisible, I was able to determine that there were two different font types and two different font sizes." *Id.* As to the difference in the visible date and the invisible date—i.e., the date hiding underneath the visible date text—Danner stated that it "signifie[d] to me that someone altered this document in order to show a different date of transmission. Specifically, it was altered to show an earlier transmission date of Wednesday, June 22nd, 2016 at 3:25 p.m." *Id.* at 183. He stated that based on his analysis, however, he believes this e-mail was actually sent on Friday, July 8, 2016. *Id.* at 186. Danner also noted some smaller inconsistencies in the e-mail documents that further confirmed his belief that the e-mail in issue had been manually altered and that Harrington's e-mail was not originally a part of the PDF file submitted to the court by Rosales. *Id.* at 186.

After testifying to his methods and what they revealed, Danner performed a live demonstration for the court of all the actions that he took and the results they produced so that the court could see in real time the ways in which the document was altered. *See id.* at 178–83.

In summary, Danner stated his belief that the e-mail was fabricated was based on the different font size and type apparent in the metadata of the document, the text hidden behind the various header fields, and the lack of a semicolon in the "to" field. *Id.* at 188–89. He stated that his report containing these conclusions was reviewed and confirmed by two other technicians at his company pursuant to their administrative and technical review procedures. *Id.* at 189.

On cross-examination, Rosales asked two questions. First, he inquired about Danner's hourly rate. *Id.* at 190. Next, he asked whether he had examined Harrington's e-mail account, to which Danner responded he had not. *Id.*

####          4.          *Valdez-Payan Testimony*

Valdez-Payan identified herself as an executive assistant at TCRP.  *Id.* at 192.  She stated she was born in Mexico City and moved to the United States at sixteen.  *Id.* at 192–93.  Spanish is her first language.  *Id.*  She testified that she sent the el sapo e-mail that formed the basis of Rosales' racism accusations.  *Id.* at 193–94.  She stated that she understood el sapo to mean toad in Spanish.  She acknowledged that she did not mean the term as a compliment and explained that she used the word because: "I don't have the best opinion [of Rosales] professionally, and it was just a facetious descriptor for my opinion of him in terms of an attorney."  *Id.* at 195.  She states that in no way did she intend the term to have any racist or ethnic connotations and that, as a Mexican-American herself, she takes umbrage with Rosales' accusations.  *Id.*  She noted that the e-mail she sent containing the word el sapo was a private e-mail that she never published or distributed anywhere and that the matter would not have been made public but for Rosales' decision to make the e-mail part of his own court filings.  *Id.* at 201.  Valdez-Payan further stated that she worked closely with Harrington at TCRP and never observed any mental issues of the type alleged by Rosales.  *Id.* at 197.

Next, Valdez-Payan testified to the personal actions Rosales has taken against her.  First, he filed a complaint with her employer, threatening to endanger the tax-exempt status of TCRP because she called him el sapo.  *Id.* at 199.  In addition, she described a lawsuit Rosales filed in federal court in Brownsville, Texas naming her among the defendants and accusing her of slander.  *Id.* at 199.  She stated that she has had to retain counsel to defend that suit.  *Id.* at 200.

On cross-examination, Rosales asked whether he had ever been mean to Valdez-Payan in any of the depositions they mutually attended.  *Id.* at 202.  She responded that he had not.  *Id.*

Defendants then rested their case. Rosales had the floor, but, as previously mentioned offered no evidentiary exhibits and did not call any of his own witnesses.

5.   *Questioning by the Court and Findings*

Based on the prior testimony which revealed that Rosales had filed suit against Valdez-Payan in Brownsville, the undersigned inquired why the pleadings in that case stated that Rosales resided in Cameron County when he used a Travis County address for all of the cases filed in this court, and in his application for an ex parte protective order filed against Harrington in a Travis County court. *Id.* at 207–09. Rosales stated that he does reside in Cameron County. *Id.* at 208. When pressed by the undersigned regarding this inconsistency, Rosales invoked his Fifth Amendment right against self-incrimination and refused to answer any more questions, stating that he did not want to incriminate himself. *Id.* at 208. The court then clarified with Rosales that he was invoking this right with respect to any and all questions from the court, including questions pertaining to the e-mail fabrication issue. *Id.* at 209–10. Based on this invocation, Defendants decided not to call Rosales to the stand.

The undersigned then made some specific findings based on the testimony and evidence provided at the hearing. Specifically, the undersigned found that Rosales had conducted himself in bad faith throughout the litigation of these six cases. *Id.* at 211. Based on the evidence presented, including Rosales' statement that all charged conduct was his alone, the undersigned did not make a "bad faith" finding as to Deutsch.

## II.   LEGAL STANDARDS

### A.   Inherent Power Sanctions

A district court has the inherent authority to impose sanctions "in order to control the litigation before it." *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 703 (5th

Cir. 1990), *aff'd sub nom. Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).  "In order to impose sanctions against an attorney under its inherent power, a court must make a specific finding that the attorney acted in 'bad faith.'"  *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir. 1995). The court also has inherent power to impose sanctions when other rules do not provide an adequate remedy.  *See Chambers*, 501 U.S. at 50 ("[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.").  The Fifth Circuit has made clear, however, that "it does not necessarily follow that inherent power starts where rule or statute ends."  *NASCO*, 894 F.2d at 702.  Reliance on this inherent authority is appropriate when there is a "wide range of willful conduct" implicating multiple rules, *Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1418 (5th Cir. 1995), or when the conduct at issue is altogether "beyond the reach of the rules," *Chambers*, 501 U.S. at 51. Using the court's inherent power in such situations promotes efficiency and avoids the needless satellite litigation that would occur if the court had to apply the rules to each discrete occurrence separately before invoking its inherent power.  *Woodson*, 57 F.3d at 1418.

This inherent power includes the power to award attorney's fees in certain circumstances. *Chambers*, 501 U.S. at 45, (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980)). "A court should invoke its inherent power to award attorney's fees only when it finds that 'fraud has been practiced upon it, or that the very temple of justice has been defiled.'"  *Boland Marine & Mfg. Co. v. Rihner*, 41 F.3d 997, 1005 (5th Cir. 1995) (quoting *Chambers*, 501 U.S. at 46).  In addition, it has long been recognized that this power includes the inherent authority to suspend or disbar lawyers.  *In re Snyder*, 472 U.S. 634, 643 (1985) (citing *Ex Parte Burr*, 22 U.S. 529

(1824).  "It is extremely desirable that the respectability of the bar should be maintained, and that its harmony with the bench should be preserved.  For these objects, some controlling power, some discretion ought to reside in the Court.  This discretion ought to be exercised with great moderation and judgment; but it must be exercised."  *Ex parte Burr*, 22 U.S. at 530.  Moreover, a district court has "the power and the obligation to protect the public and the efficient administration of justice" from vexatious litigation.  *In re Martin–Trigona*, 737 F.2d 1254, 1262 (2d Cir. 1984).  *See also Peabody v. Schroll Trust*, 892 F.2d 772, 777 (9th Cir. 1989) (recognizing that, in addition to its inherent power to sanction attorneys for reasons related to its own docket, a district court has "a broader duty to the public, as well"); *Standing Comm. on Discipline v. Ross*, 735 F.2d 1168, 1170 (9th Cir. 1984) (stating that, in a disciplinary proceeding, "[t]he court must consider . . . the need to protect the public from an unqualified or unscrupulous practitioner.").

### B.      Rule 11

Federal Rule of Civil Procedure 11 authorizes a court to impose sanctions on a party who files a pleading for an improper purpose, such as to harass the opposing party, delay the proceedings, or increase the expense of litigation.  FED. R. CIV. P. 11(b)–(c).  Sanctions under Rule 11 may be appropriate if the Court finds that a document has been presented for an improper purpose, FED. R. CIV. P. 11(b)(1)–(2); the claims or defenses of the signer are not supported by existing law or by a good-faith argument for an extension or change in existing law, FED. R. CIV. P. 11(b)(2)–(3); or the allegations and other factual statements lack evidentiary support or are unlikely to do so after a reasonable opportunity for investigation, FED. R. CIV. P. 11(b)(3).  The purpose of the rule is to "deter baseless filings in district court," *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990), and "to spare innocent parties and overburdened

courts from the filing of frivolous lawsuits," *Kurkowski v. Volcker*, 819 F.2d 201, 204 (8th Cir. 1987).   After notice and opportunity to respond, courts finding a Rule 11(b) violation may impose appropriate sanctions.  FED. R. CIV. P. 11(c)(1).   These may include monetary and injunctive sanctions, *Farguson v. MBank Houston, N.A.*, 808 F.2d 358, 359–60 (5th Cir. 1986), and even dismissal, *see Jimenez v. Madison Area Tech. Coll.*, 321 F.3d 652, 657 (7th Cir. 2003). Courts have a duty to impose the least severe sanction that is sufficient to deter future conduct. *Mendoza v. Lynaugh*, 989 F.2d 191, 196 (5th Cir. 1993); FED. R. CIV. P. 11(c)(4).   A court may impose sanctions on its own initiative under Rule 11(c)(3) even after a party has moved for Rule 11 sanctions without complying with the safe harbor provision.  *See Brunig v. Clark*, 560 F.3d 292, 297–98 & n.18 (5th Cir. 2009); *Elliott v. Tilton*, 64 F.3d 213, 216 (5th Cir. 1995).   Rule 11(c)(3) requires courts to issue a show cause order before sua sponte imposing sanctions.  *See* FED. R. CIV. P. 11(c)(3).

## III.   THE COURT'S FINDINGS

### A.     Findings Regarding Rosales' Conduct

The undersigned finds that the evidence presented at the hearing and in Defendants' briefing conclusively establishes that Rosales engaged in serious and habitual misconduct—from making false and offensive statements about Harrington in multiple court filings to knowingly submitting fabricated evidence.[15]   The undersigned will highlight some of the evidence that overwhelmingly establishes Rosales' various bad faith conduct.

---

[15] The Fifth Circuit has not definitively determined the evidentiary standard that applies to a court's imposition of inherent power sanctions. *Compare U.S. Dist. Court S. Dis. of Tex. Victoria Div. v. Greeson*, 167 F. Supp. 3d 835 (S.D. Tex. 2016) (stating that "arguably" a "clear and convincing" burden of proof standard applies for a court's imposition of inherent power sanctions) *with White v. Reg'l Adjustment Bureau, Inc.*, 647 F. App'x 410, 411 n.1 (5th Cir. 2016) (suggesting that the higher burden of clear and convincing evidence is not always required). The undersigned finds that even if the higher clear and convincing standard is applied, the sanctions in this case are supported by clear and convincing evidence of bad faith.

### 1.    *False, Abusive Statements*

As to the evidence that Rosales made twenty-nine false statements about Harrington in 113 separate filings, the undersigned takes judicial notice of the court filings in all six cases.  A full list of the statements, with their corresponding docket citations is contained in the Appendix attached to this Order.  On the issue of Harrington's character—specifically, that his character proves these statements to be false—the court finds the testimony of Balli Torres, Valdez-Payan, and Harrington credible.  The court likewise finds the declarations of Michael E. Tigar, Senator Jose Rodriguez, Senator Rodney Ellis, Renato Ramirez, and Richard P. Daly credible.[16]  Hearing Exhibits, Ex. 36 [Dkt. #107] in *Clark*.  Harrington's career-long commitment to defending and promoting the civil rights of minorities—especially Hispanics and persons with disabilities—is irrefutable. His resume, his own sworn testimony, the sworn testimony of Balli Torres, and the sworn declarations of two state senators, a law professor, the CEO of a local bank, and a member of the clergy—each of whom has known Harrington for several decades, both personally and professionally—provide compelling rebukes to Rosales' outlandish claims that Harrington is racist, anti-Semitic, or schizophrenic.

In response to Defendants' overwhelming evidence that these statements are false and abusive, Rosales presented almost no defense.  Indeed, the only justification Rosales offered for his submission of over 100 court filings full of ad hominem, outrageous attacks on Harrington's character, was that Harrington referred to him as el sapo in an e-mail.  The undersigned find this attempt at a defense lacking for several reasons.  First, Rosales presented no evidence that Harrington himself used that term to describe Rosales.  Indeed, Rosales does not dispute that the

---

[16] Rosales objected that these declarations were inadmissible as hearsay and impermissible character evidence. The undersigned overruled this objection, finding that Rosales had put Harrington's character in issue, FED. R. EVID. 404 advisory committee's note to 1972 proposed rules, and that the declarations met the hearsay exception for reputation concerning character, FED. R. EVID. 803(21).

e-mail containing this term was written by Valdez-Payan, a Mexican-American, and merely inadvertently forwarded to Rosales by Harrington. Second, while both Valdez-Payan and Harrington acknowledged that the el sapo reference was not intended as a term of endearment, the court finds that the defense's witness testimony and documentary evidence conclusively proves that this term is not an ethnic slur and that they did not intend this term as a racial or ethnic slur. Third, Rosales' only evidence provided in support of his incredible claim of the racist nature of this slight is a citation to a crowdsourced online dictionary that was founded as a parody of legitimate dictionary sources. *E.g.*, Jenna Wortham, *A Lexicon of Instant Argot*, N.Y. Times (Jan. 3, 2014), http://www.nytimes.com/2014/01/04/technology/a-lexicon-of-the-internet-updated-by-its-users.html?ref=technology. Fourth, unlike Rosales' reiteration of his claims of Harrington's racism, cowardice, and anti-Semitism in myriad court filings, Harrington did not publicize the use of el sapo in connection with Rosales. Rather, the reference only entered the public realm when Rosales filed the e-mail attachment in his own motion.

The court does not present these points to defend name-calling between parties in federal court. Indeed, the court believes it is unprofessional to refer to someone as a toad, and had Defendants made that reference in a court filing, the court may have ordered them to strike it. Rather, the court's point is that Rosales' attempt to defend his twenty-nine unique ad hominem attacks against Harrington, which he submitted in 113 separate court filings, by pointing to Valdez-Payan's reference to him as el sapo is preposterous. By its nature, our judicial system is adversarial, litigation is often contentious, and people make mistakes and say things they do not mean, or at least do not mean to say aloud. Harrington's inadvertent forwarding of an e-mail where Valdez-Payan referred to Harrington by the Spanish word for toad was such a mistake.

And, like the respected professional Harrington is, he apologized to Rosales immediately upon learning of this mistake.

By contrast, Rosales' twenty-nine false statements, repeated 113 times are not mistakes—they are habitual, bad faith misconduct that demean not only their intended recipient, but Rosales and the federal court in which he filed them as well.  And, while it would hardly cure the harm, Rosales has not even apologized.

2.	<em>E-mail Fabrication</em>

On the issue of the e-mail fabrication, the court finds Harrington and the expert witness, Danner, credible.  The evidence presented tells the following story: Rosales sent the e-mail to himself, doctored it to change both the recipient and the date sent, and then filed it with his response to Defendant's motion to compel in hopes of influencing the court's ruling on that motion.   Danner's detailed forensic analysis, discussed above, makes any other narrative untenable.

Despite this seemingly incontrovertible evidence, Rosales initially maintained in open court at the show cause hearing that he did in fact send the e-mail at issue to Harrington on the "visible" date that appeared in the attachment:

> MR. ROSALES: Your Honor, I did send the e-mail to him, but also, he also did not provide dates. . . .
>
> THE COURT: Okay. So just so that we're clear, are you clear —
>
> MR. ROSALES: Yes, your Honor —
>
> THE COURT: — on the e-mail that's attached at Exhibit No. 4 to document No. 62 in the Clark case? You sent that e-mail on the date and at the time that — as noted.
>
> MR. ROSALES: Yes, your honor.

Show Cause Tr. at 27–28.

34

Rosales presented no evidence, other than his statements, that he sent the e-mail on the date and to the recipient that appeared in his exhibit attachment.  It is clear from Harrington and Danner's testimony and Danner's expert report, however, that Rosales was lying. When pressed by the court to expand on his claim that he did not fabricate the e-mail, he pleaded the Fifth.  *Id.* at 209.

While Rosales has neither apologized for nor recognized the seriousness of his conduct, it is now essentially undisputed that Rosales (1) made false and offensive statements about opposing counsel in myriad court filings which he either knew or should have known to be false; (2) submitted fabricated evidence to this court; and (3) lied about doing so in multiple court filings and at the show cause hearing.  The same evidence establishes the latter two forms of grievous misconduct: the lie is his claim that he sent Harrington the fabricated e-mail.  Rosales did not dispute Danner's testimony and report regarding the fabrication of the e-mail—either with his own exhibit evidence or by presentation of his own expert. Indeed, he barely cross-examined Defendants' expert at the show cause hearing.

### 3. Criminal Stalking Charge, Ex Parte Protective Order, and Motion for Separate Hearing

The undersigned finds that the evidence presented at the hearing proves that Rosales filed a groundless report with the Austin Police Department alleging that Harrington was stalking him and applied for an ex parte protective order based on this report in bad faith. As a result of this application, Harrington was forced to retain counsel and seek emergency relief from the County Court to dissolve the protective order.  After an evidentiary hearing, the County Court dismissed the protective order.  *See* Supp. Mem. [Dkt. #82] at 11.  In reviewing these same allegations which Rosales used to form the basis of a motion for adverse inference and sanctions against Harrington in the *Clark* case, this court found them to be "baseless" and "fantastical."  Order of

May 27, 2016 [Dkt. #30] in *Clark* at 3*; see also* Mot. Adv. Inf. [Dkt. #15] in *Clark*.  Again, the undersigned finds Rosales' testimony that he feared for his safety based on Harrington's observation of the type of car Rosales drove not credible.

The undersigned further finds that Rosales' motion requesting a separate hearing in the *Clark* case, filed after obtaining the ex parte protective order, was filed for an improper purpose. *See* Mot. Separate Hearing [Dkt. #25] in *Clark*.

### 4.   *Violation of Texas Disciplinary Rules of Professional Conduct*

While the undersigned believes that Rosales' multifarious misconduct in these cases violates numerous disciplinary rules, it will leave that determination to the appropriate disciplinary bodies of the Federal and state bar associations.

### B.   **Findings Regarding Culpability Determination**

At the hearing, the undersigned found that Rosales had conducted himself in bad faith throughout this litigation, from the false statements about Harrington contained in his various filings, to the submission of the fabricated e-mail, to his filing of a police report and application for an ex parte temporary restraining order against Harrington.  *See* GREGORY P. JOSEPH, SANCTIONS § 27(A) (5th ed. 2013) ("The essential element in triggering an award of sanctions is the existence of bad faith on the part of the offender. A finding of bad faith is sine qua non to the imposition of inherent power sanctions.") (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765–66 (1980); *Alyeska Pipeline Serv. v. Wilderness Soc'y*, 421 U.S. 240, 258–59 (1975)). Rosales testified that he was solely responsible for the complained of pleadings and filings, and that the conduct directed towards Harrington was his alone and not his client's. Show Cause Tr. at 106.  Because bad faith is personal to the offender, *Browning Debentures Holders' Comm. v. DASA Corp.*, 560 F.2d 1078, 1089 (2d Cir. 1977), the undersigned does not impute Rosales' bad

faith to Deutsch.  Therefore, Rosales alone is the culpable party for the sanctionable conduct in these cases.

In *NASCO, Inc. v. Calcasieu Television and Radio, Inc.*, 124 F.R.D. 120 (W.D. La 1989), the district court imposed a bevy of sanctions pursuant to its inherent power, including almost $1 million in attorneys' fees and costs and disbarment of an attorney.  This decision was affirmed by the Fifth Circuit and Supreme Court without comment.   In that case, the district court dedicated some ink to describing why the attorney defendants' sanctioned conduct was "distinctly different" from the other lay defendants under consideration.  The undersigned finds the court's words applicable to Rosales:

> An attorney is schooled in the law. Because of his unique relationship with his clients and with the public, he is taught ethics and governed by rules of professional ethics. The Court has a right to expect him, as an officer of the Court, to lend his assistance in preserving order and decorum in the Court; to be truthful and forthright with the Court and other counsel; to be truthful and not mislead the Court or other counsel. His signature certifies that pleadings and other documents filed by him are "to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Rule 11. He is bound to preserve the integrity of the law and the Constitution of the United States and the several states and to seek justice in his representation of clients before the Court. In his conduct in this case, [counsel] has actively violated almost every one of these ethical and professional responsibilities.

*NASCO, Inc.*, 124 F.R.D. at 144 (W.D. La. 1989), *aff'd and remanded*, 894 F.2d 696 (5th Cir. 1990), *aff'd sub nom.*, *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).  The same sentiments apply to Rosales' conduct in these cases.  He has repeatedly misled the court regarding the basis for and intent of multiple motions and other filings;[17] he used the federal judiciary's public filing service to conduct a systematic character assassination of one Austin's most dedicated defenders

---

[17] *See generally* Def. Mot. Summ. J. [Dkt. #50] in *Draker* (stating that Defendant's property was remodeled and brought into compliance with ADA requirements before Deutsch filed his lawsuit).

of the rights of the marginalized; and he actively misled the court by falsifying a document which he submitted as evidence to influence a judicial ruling.  He has abused both the letter and the spirit of one of our nation's landmark antidiscrimination statutes, debasing its purpose and trivializing the needs and rights of those it was enacted to protect.

## IV.   SANCTIONS

Because the wide range of conduct at issue in this case does not fall neatly within Rule 11, or any other Rule, the Court will apply the inherent powers framework.[18]  *E.g.*, *Greeson*, 167 F. Supp. 3d at 845. *See also* GREGORY P. JOSEPH, SANCTIONS § 26(A)(1)(a) (5th ed. 2013) ("If, however, 'neither the statute nor the rules are up to  the task,'—e.g., if they do not cover the complete gamut of misconduct—the federal courts may rely on their inherent power in sanctioning the totality of abusive behavior before them.") (quoting *Chambers*, 501 U.S. at 50). The undersigned notes that the procedural due process protections of notice and opportunity to be heard were met: the court warned Rosales multiple times of the possibility of sanctions, conducted a preliminary hearing on potential sanctions, issued a show cause order specifying the alleged sanctionable conduct, allowed Rosales time to respond to the allegations, and held a show cause hearing at which Rosales was free to testify and provide evidence in his defense. *See, e.g.*, *Chambers*, 501 U.S. at 50 (observing that a court must comply with due process mandates before imposing sanctions under its inherent power); FED. R. CIV. P. 11 advisory committee's note to 1993 amendment ("[T]he procedures specified in Rule 11—notice,

---

[18] By this declaration, the undersigned does not intend to "waive" any ability to impose sanctions pursuant to Rule 11(c)(3). To the extent that Rule 11(c)(3) bestows authority on this court to award sanctions in this matter, the court invokes that authority. *See Clark v. Mortenson*, 93 F. App'x 643, 653 (5th Cir. 2004) (per curiam) (stating that it was not error for the district court to state whether Rule 11 or § 1927 served as the basis for its sanction order and asserting that "a court need not provide specific factual findings in every sanction order. . . . [T]he fact that the district court did not state what authority it was basing the sanctions on does not require reversal").

opportunity to respond, and findings—should ordinarily be employed when imposing a sanction under a court's inherent power.").

Before specifying the discrete sanctions awards, however, the Magistrate Court must declare what should go without saying: the ADA is a landmark and necessary piece of antidiscrimination legislation, and its enforcement has empowered countless Americans. Both private citizens and the attorney general have used Title III's rights of action in admirable ways to improve access to various facilities to individuals with disabilities. The court's issue, of course, is not with Title III of the ADA, nor is it even with Rosales' actions in finding a willing plaintiff for almost 400 cases. Rather, the Magistrate Court's issue is the abusive, disrespectful, and fraudulent manner in which Rosales has conducted this litigation. From his baseless and offensive attacks on opposing counsel, memorialized in over a hundred court filings, to his fabrication of an e-mail submitted as evidence to the court, Rosales has behaved in embarrassing and shocking ways throughout this litigation. Indeed, the Fifth Circuit, which thus far has seen only a slice of these acrimonious proceedings, has already expressed its disapproval. In a concurrence to the Court of Appeals' denial of one of Rosales' writs of mandamus, Judge Elrod wrote: "I write separately to note my concern with the derogatory written exchanges between counsel that appear in the record. These exchanges do not reflect the best in Texas lawyers." *In re Jon R. Deutsch*, No. 16-51121 (5th Cir. Oct. 19, 2016) (Elrod, J., concurring). In short, Rosales' conduct demeans both the honorable legislation he invokes and the judicial system he has attempted to make his unwitting accomplice.

This District and these Defendants are not the first to fall victim to abusive ADA litigation of the Rosales mold. Indeed, a review of the case law shows similar litigation clogging

district courts from Florida to California.  A Central District of California opinion discussing the

phenomenon is almost chilling in its applicability to the cases at bar:

> The ability to profit from ADA litigation has given birth to what one Court described as "a cottage industry." *Rodriguez v. Investco, L.L.C.*, 305 F. Supp. 2d 1278, 1280–81 (M.D. Fla. 2004). The scheme is simple: an unscrupulous law firm sends a disabled individual to as many businesses as possible, in order to have him aggressively seek out any and all violations of the ADA. Then, rather than simply informing a business of the violations, and attempting to remedy the matter through "conciliation and voluntary compliance," *id.* at 1281, a lawsuit is filed, requesting damage awards that would put many of the targeted establishments out of business. Faced with the specter of costly litigation and a potentially fatal judgment against them, most businesses quickly settle the matter. The result of this scheme is that "the means for enforcing the ADA (attorney's fees) have become more important and desirable than the end (accessibility for disabled individuals)." *Brother v. Tiger Partner, LLC*, 331 F. Supp. 2d 1368, 1375 (M.D. Fla. 2004). Serial plaintiffs . . . serve as "professional pawn[s] in an ongoing scheme to bilk attorney's fees." *Rodriguez*, 305 F. Supp. 2d at 1285. It is a "type of shotgun litigation [that] undermines both the spirit and purpose of the ADA." *Brother*, 331 F. Supp. 2d at 1375.

*Molski v. Mandarin Touch Rest.*, 347 F. Supp. 2d 860, 863 (C.D. Cal. 2004), *aff'd in part,*

*dismissed in part sub nom. Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047 (9th Cir. 2007).

Yet, even worse than the potential profit-making motive behind these suits is the way in

which Rosales has conducted this litigation.  And it is this conduct—not the merits of the suits—

which is currently before the Magistrate Court.  Because Rosales has conducted himself in bad

faith throughout this litigation, as evidenced by the many hearings, court filings, and this Order,

the undersigned finds the following sanctions are merited.

### A.     Monetary Sanctions

#### 1.     Attorneys' Fees and Costs

The court's inherent power to sanction includes the power to award attorneys' fees and

costs in an amount designed to provide full relief to the aggrieved party.  *See Alyesksa Pipeline*,

421 U.S. 240; *Roadway Express, Inc.*, 447 U.S. 752 (1980).  The amount of the assessment is a

matter of discretion for the court; the purpose of the assessment is punitive.  GREGORY P. JOSEPH,

SANCTIONS § 28(B)(2) (5th ed. 2013).  *See also NASCO, Inc.* 124 F.R.D. at 147 (imposing sanctions of almost $1 million in attorneys' fees and expenses); *Stalley v. Mountain States Health Alliance*, 644 F.3d 349, 352 (6th Cir. 2011) ("[Appellant] contends that the district court did not 'explain[] why all of the fees and expenses incurred [by Defendants'] law firm . . . had to be awarded to assured the desired deterrence.' . . . However, we have explained that 'sanctions imposed . . . pursuant to a court's inherent authority are [also] punitive.' . . . So even assuming that the award was greater than necessary to deter future violations—a contention of which [appellant] has failed to convince us—another valid basis exists for the award. . . .  And the amount of the award does not strike us as unreasonable under the circumstances.") (internal citations omitted).

Among the expenses that a court may order reimbursed are expert witness fees needlessly incurred by an opponent as a result of bad faith misconduct of the sanctioned party.  *Barnes v. Dalton*, 158 F.3d 1212, 1215 (11th Cir. 1998).  To impose an award of fees and expenses pursuant to a court's inherent power, a court must make a specific finding that the party at issue acted in bad faith. *See Matta v. May*, 118 F.3d 410, 416 (5th Cir. 1997) ("A court may assess attorney's fees under its inherent powers when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons" but "must make a specific finding that the sanctioned party acted in bad faith in order to impose such sanctions").  The undersigned has already found that Rosales conducted himself in bad faith throughout this litigation.  In the Fifth Circuit, courts normally apply a lodestar analysis to calculate attorneys' fees in a sanctions context, multiplying the hours expended by the appropriate hourly rates.  *See, e.g.*, *Tollett v. City of Kemah*, 285 F.3d 357, 367 (5th Cir. 2002).

41

Rosales' abuse of the litigation process has imposed substantial burdens on Defendants, including attorneys' fees—incurred both by Harrington in his own right in having to deal with spurious motions and protracted discovery disputes on Defendants' behalf, as well as the attorneys' fees incurred by Harrington's counsel, which he was forced to obtain when Rosales filed baseless sanctions motions against him—as well as costs.  The undersigned therefore finds that both Harrington and Herring are entitled to their reasonable attorneys' fees and costs incurred in this case as a result of Rosales' litigation misconduct, bad faith, and fraud.

The fees claimed by Harrington and Herring were assembled, documented, and filed with the court and served on Rosales.  *See* Supp. Mem. II. [Dkt. #109] in *Clark*.  Harrington and Herring's fee submissions are accompanied by detailed supporting evidence documenting the lodestar calculation, including sworn declarations and billing records, as well as citations to relevant authorities justifying the itemized number of hours expended in connection with the recoverable attorneys' fees as well as the reasonable rates requested.  *Id.*  The claimed amounts reflect only the amounts expended by Harrington and Herring as a result of Rosales' misconduct, and not the fees incurred by Harrington in the normal course of this litigation.  Rosales has not challenged the amounts claimed, either with respect to the rates charged or hours billed.  Indeed, he did not file any response.

In his declaration, Harrington states he has been a civil rights lawyer and practicing attorney for forty-three years.  Supp. Mem. II Ex. 2. [Dkt. #109-2] ("Harrington Decl.") at 1.  He notes that he is the founder and director emeritus of the Texas Civil Rights Project, having served as its executive director for twenty-six years.  *Id.*  Today, TCRP has five statewide offices and a staff of forty persons.  *Id.*  He also recites his extensive work in disability rights litigation, including his work as part-time director of the Americans with Disabilities National Backup

Center and as Regional Litigation Attorney with Disability Rights Texas from 1993-1995.[19] Indeed, Harrington's relevant work experience and professional honors are too various and voluminous to summarize.

For the cases at bar, Harrington seeks recovery for 71.65 billable hours at a rate of $600 per hour for a total of $42,990 for his work on these six cases.  Harrington states that his rate is reasonable based on his forty-six years as a practicing civil rights attorney in Texas and his status as a leading civil rights attorney in Texas and a nationally recognized disability rights expert. *See* Harrington Decl. at 5.  He also seeks recovery for 17.1 hours of work conducted by his legal assistant, Valdez-Payan, at a rate of $100 per hour.   In total, Harrington seeks recovery of $44,700 in fees. *See* Supp. Mem. II Ex. 2B.

Herring in turn seeks recovery for the time and expenses incurred by his law firm, Herring & Panzer, L.L.P., in connection with the cases for which his firm is counsel of record for Defendants, specifically the *Clark*, *Draker*, and *Henry* cases.  Supp. Mem. Ex. 1[Dkt. #109-1] ("Herring Decl.") at 1.  The expenses sought include the expert expenses for retaining Danner; costs of transcripts from three hearings related to these cases; the fee for serving Yahoo with the subpoena for Rosales' e-mail headers; costs for certain copy services; and the cost of a certified copy of the Application for Protective Order filed by Rosales in state court for use at the Show Cause Hearing.  *Id.* at 2.  Herring seeks recovery for 168.8 hours of his own work at a rate of $600 per hour; for 131.25 hours of work by his partner Jason Panzer at a rate of $450 per hour; and for 83.15 hours of work by an associate attorney Lauren Ross ("Ross") at a rate of $350 per hour.  Supp. Mem. II Ex. 1A. In total, Herring requests $189,448 in fees and $6,588.78 in costs. *Id.*

---

[19] At the time, the organization was called Advocacy, Inc.

In defending the reasonableness of these rates, Herring notes that he has been practicing law in Texas for nearly forty-one years, during which time he served as head of the Austin litigation group at Jones Day, one of the largest law firms in the United States. Herring Decl. at 6. His practice at Jones Day centered on complex litigation, with a special focus on lawyer-liability cases. In 1994, he started his own firm, Herring & Panzer, L.L.P., which focuses almost exclusively on handling lawyer-liability cases. *Id.* at 6–7. Panzer has practiced law for almost twenty years, specializing in legal malpractice cases since at least 2001. *Id.* at 9. Along with Herring, he is the co-author of the TEXAS GUIDE TO LAWYER DISQUALIFICATION. Ross has practiced law for ten years. *Id.* at 10. In 2016, Thomson Reuters named Ross a "Texas Super Lawyers Rising Star" in the area of Administrative Law. *Id.* at 11.

The undersigned recognizes that the fee amounts claimed by Harrington and Herring are significant. Yet these attorneys, especially Harrington and Herring, are experts in their respective fields. Indeed, Harrington and Herring have almost ninety years of legal experience between them. Rosales—first in filing these suits and then in conducting himself in bad faith throughout—picked this fight. As such, the court agrees with the sentiments expressed in *Dayan v. McDonald's Corp.*, No. 70CH2258 (Ill. Cir. Ct. March 1, 1983) and quoted favorably by the Fifth Circuit in *Schwarz v. Folloder*, 767 F.2d 125 (5th Cir. 1985):

> It is unbecoming for the plaintiffs to hail the defendant into court by means of false allegations and then to complain when the defendant hires skillful, experienced and expensive advocates to defend against those allegations. Having wrongfully kicked the snow loose at the top, [the plaintiff] must bear the consequences of the avalanche at the bottom.

*Schwarz*, 767 F.2d at 133–34.

The allegations contained in the six complaints before the court were not necessarily all false—Deutsch may have visited some of these premises and some may have been out of compliance, in at least the most technical sense, with the ADA and its attendant regulations. Yet,

Defendants have argued that in at least one suit—*Draker*—the property was *not* out of compliance at the time Deutsch brought suit.[20]   Regarding Rosales' motions for sanctions and the allegations launched at Harrington, the above-cited paragraph could not be more on point. Rosales cannot repeatedly hurl offensive and baseless allegations at Harrington and then expect to avoid the financial consequences when Harrington obtains top-flight representation to defend against this character assassination.  As Rosales has made his bed, he must lie on it.

Furthermore, it is clear from their declarations and logs of billable hours that the attorneys exercised billing judgment. Harrington avers, *inter alia*, that he intentionally did not include "extensive e-mail exchanges and telephone calls with co-counsel" and Valdez-Payan. Herring and his team excluded over 170 hours from their final time and expenses record.  *See* Harrington Decl.; Supp. Mem. II Ex. 1A.

Nevertheless, the undersigned finds there are some ways in which the lodestar amount must be reduced. In the attachment itemizing his billable hours for these six cases, Harrington includes 1.25 hours for "preparation for hearing on motion for sanctions in *Throckmorton* matter."  *See* Supp. Mem. II Ex. C at 5.  *Throckmorton* is a separate case that has not been referred to this Magistrate Court and was not the subject of our sanctions hearing.  As such, the undersigned finds that this 1.25 hours must be excised from Harrington's reasonable hours expended, bringing his hours down to 70.40 from 71.65.

In addition, the undersigned finds that the rates claimed by each attorney must be reduced. In reducing these rates, the undersigned does not necessarily intend to imply that Harrington and Herring are not worth the rates they claim—a cursory glance at either man's resume demonstrates stunning professional experience and achievements.  Furthermore, the fact that Rosales has not contested the rates requested could, standing alone, give the court a

---

[20] *See generally* Def. Mot. Summ. J. [Dkt. #50] in *Draker*.

greenlight to approve them.  *See Tollet*, 285 F.3d at 369 (questioning reasonableness of rate claimed, based on counsel's own affidavit, but ultimately approving it "*only because*" the opponent did not contest it) (emphasis added).  Yet, the undersigned is likewise mindful that the "relevant market for purposes of determining the prevailing rate to be paid in a fee award is the community in which the district court sits."  *Id.* at 367–68.[21]  The undersigned takes judicial notice of the State Bar of Texas 2015 Hourly Rate Fact Sheet ("Fact Sheet"), which reports median hourly rates by years of experience, practice area, and region.  STATE BAR OF TEXAS, 2015 HOURLY RATE FACT SHEET.  The Fact Sheet reports the following relevant statistics: the 2015 median hourly rate for attorneys in Texas with over 25 years of experience is $300; the median hourly rate for attorneys in Austin is $300; and the median hourly rate in the practice area of ethics and legal malpractice is $273.  *Id.* at 3, 6, 8.  The undersigned notes that Harrington and Herring's hourly rates of $600 and Panzer's rate of $450 exceed the average community standards. As a result, the undersigned finds that Harrington and Herring's rates should be reduced to $450; Panzer's rate should be reduced to $300; Ross' rate should be reduced to $250; and Valdez-Payan's rate reduced to $75. These reductions bring the rates closer in line with the median rates for attorneys in the relevant community with similar years of experience.

Based on these rate reductions, the undersigned awards Harrington $32,962.50 in fees,[22] and Herring & Panzer $136,122.50 in fees and $6,588.78 in expenses.[23]

---

[21] The undersigned also notes that some circuits embrace a requirement that the offender's ability to pay a financial sanction imposed under a court's inherent power be considered in the fee award. *See, e.g.*, *Martin v. Automobil Lamorghini Exclusive, Inc.*, 307 F.3d 1332, 1338 (11th Cir. 2002) (reversing $1.5 million sanction where district judge did not consider each offender's ability to pay the sanction).

[22] This figure results from multiplying Harrington's $450 hourly rate by his 70.4 billable hours and adding it to Valdez-Payan's fees, obtained by multiplying her hourly rate of $75 by her billable hours of 17.1. *See* Supp. Mem. II Ex. 2B.

[23] The undersigned obtained this figure by multiplying the Herring & Panzer attorneys' reduced hourly rates by the billable hours cited in Ex. 1A.

### B.    Nonmonetary Sanctions

The undersigned finds it appropriate that an objective body review the actions of Rosales in this matter. Therefore, the undersigned **REFERS** the issue to the Western District of Texas Disciplinary Committee, Karl O. Bayer Jr., Esquire, who is the chair of the committee, to address whether further sanctions are appropriate.  Among possible additional sanctions, the court specifically requests that the Committee consider whether disbarment from the Western District of Texas is proper.  Finally, the court requests that the Committee consider whether forwarding this Order and the Committee's findings to the State Bar of Texas and any other state and federal licensing authorities is appropriate.

## V.    CONCLUSION

The ADA is not a perfect law, and the federal judiciary is not a perfect system.  Both depend on advocates who use their powers to promote justice, not pervert it.  Rosales' conduct in this litigation exploits not just the noble purposes of the legislation but also the public's faith in the ability of the justice system to render accurate and fair judgments.  The sanctions for such abuse must be harsh.

IT IS THEREFORE ORDERED that Defendants' Motion for Sanctions, filed in all six causes, is **GRANTED** as fully set forth above.  Harrington is awarded $32,962.50 in fees, and Herring & Panzer, L.L.P. is awarded $136,122.50 in fees and $6,588.78 in expenses.


SIGNED December 7, 2016.

_____

MARK LANE
UNITED STATES MAGISTRATE JUDGE

47